## RAYMOND *v.* PUTNAM.

When the amounts invested by partners in the capital stock of a firm are unequal, and one article in the copartnership agreement provides that all profits and losses shall be shared equally, and another provides that at the close of the company the assets and property shall be divided between the partners, in proportion to their investments, in making a distribution of assets at the close of the company all losses will be first considered and equalized, though no profits or losses have been adjusted or declared during the continuance of the copartnership.

In such a case, if there be a loss equal to or greater than the entire capital of the company, the loss must be apportioned equally; and although all the property of the firm be destroyed or lost, yet each partner would, under those circumstances, have a right to an account, and to have the loss equalized.

IN EQUITY. John G. Raymond, of New-Boston, in this county, complains that he entered into a copartnership with the firm of Putnam & Chase, and with the firm of Came & Palmer, by articles of copartnership as follows:

"Articles of copartnership made and concluded this fifth day of May, in the year one thousand eight hundred and fifty-one, by and between the firm of 'Putnam & Chase' — consisting of Daniel Putnam and Leonard Chase — John G. Raymond, and the firm of 'Came & Palmer' — consisting of George W. Came and Samuel Palmer — all of Milford, in the county of Hillsborough and State of New-Hampshire.

"*Whereas,* a copartnership has heretofore existed between the said Putnam & Chase and the said Raymond, under the style of 'The Milford Plow Company,' for the purpose of manufacturing

and selling plows and other agricultural implements; and whereas it is the intention of the parties hereto to form themselves into a copartnership for carrying on the said business, for which purpose they have agreed on the following terms and articles of agreement, to the faithful performance of which they mutually bind and engage themselves, each to the other, his executors and administrators.

" 1. The style of the said copartnership shall be ' The Milford Plow Company.'

" 2. The capital stock of said partnership shall be formed in the following manner: namely, the said Putnam & Chase and the said Raymond shall put into the capital stock of the partnership hereby formed, all the patterns, machinery, tools, stock and other property now owned by them jointly under the style of ' The Milford Plow Company,' and also all debts and demands owing to them in their said joint capacity, except those owing to the firm from them in their individual capacity, and that said above named property is to be considered as equivalent to the sum of six thousand five hundred dollars, to be owned in the following proportions: namely, four thousand eight hundred and seventy-five dollars — being three fourths of said sum — by the said Putnam & Chase, and one thousand six hundred and twenty-five dollars — one fourth of said sum — by said Raymond.   And the said Came & Palmer shall put into the capital stock of the said partnership hereby formed, all the patterns, machinery, tools, stock and other property now owned by them jointly, and also all debts and demands owing to their said firm, except those owing from said Came & Palmer in their individual capacity, and that said above named property is to be considered as equivalent to the sum of twelve hundred dollars.

" 3. Each member of the partnership may increase the amount he has in the capital stock at pleasure, and may diminish it, but not so that it shall be less than twelve hundred dollars.

" 4. Each member of the partnership shall be entitled to interest upon the sum by which his share in the capital stock shall exceed the smallest share owned in the said capital stock by any of said partners, and the other members of such partnership shall be jointly liable for such interest.

" 5. The losses shall be borne equally, and the profits equally divided between said partners: namely, one third to Putnam & Chase, one third to Came & Palmer, and one third to John G. Raymond.

" 6. The said Putnam & Chase shall have the care of the books of the firm, but they shall be open to the inspection of any of the partners hereto; and they alone shall have authority to make contracts on behalf of the firm, and shall give their attention to the business of the firm to an amount not exceeding the time of one person, for which they shall receive a compensation to be fixed by the parties hereafter.

" 7. The said Raymond shall give his personal care and attention to performing and seeing performed the labor of the firm, and shall receive therefor from his copartners the sum of one dollar and fifty cents for every day spent by him in such employment.

" 8. Whenever the said Came shall be employed in attending to the business of the firm, he shall be allowed a compensation therefor to be fixed hereafter.

" 9. For every day that the said Palmer shall be employed in the business of the firm, he shall be allowed by his copartners the sum of one dollar and fifty-eight cents.

" 10. Once at least, in each year, commencing the first of August, 1852, a correct account shall be taken, and stated on the ledger, of all the stock, property and assets of the firm, and of all the debts and liabilities.

" 11. At the close of the partnership a like account shall be taken and stated, and the stock and property and the debts shall be divided among the partners in proportion to the share which each has in the capital stock, after paying the liabilities of the firm.

" 12. In these articles it is to be considered that a partnership of but three members is contemplated, and that the word partner, and the personal pronouns relating to that word, refer to the firms of Putnam & Chase and of Came & Palmer, and not to the individuals of whom the firm is composed.

" In witness whereof we have herewith set our hands and seals, this fifth day of May, A. D. 1851.

" Putnam & Chase.    [L. S.]
" John G. Raymond.  [L. S.]
" Came & Palmer.    [L. S.]

" Signed, sealed and delivered in presence of
    " Mary J. Chase.
    " S. Jane Putnam."

And that said copartnership was continued at said Milford until about the 27th of October, 1854, when the same was dissolved by mutual consent; and that by the terms of the dissolution it was agreed by the said partners that said Putnam & Chase should take, and that they did take, the stock in trade and all machinery and patterns and all the manufactured articles of said company, except such manufactured articles as were in the possession of sundry individuals for sale on commission, at about.$3,490 ; that the said defendants should collect all debts due the company ; should dispose of all property in the hands of others for sale on commission ; should pay all debts of the company, and render an account to the plaintiff and pay him his proportion of the amount thus received, and of any balance due the company, after paying their liabilities, according to the provisions of the eleventh article of said partnership agreement.

The plaintiff then alleges that there were in the hands of other persons, for sale on commission, at the time of said dissolution, property to the amount and value of $2,000, for which the defendants have received pay, which they still retain ; that they have collected on debts due the company which were good $2,000, and that upon doubtful claims there was the sum of $2,000 more due the company, which might have been collected with proper care and diligence, which the defendants have neglected to collect ; that they have neglected to pay the debts of the company ; that

they have not settled up its affairs, and have never rendered any account or paid this plaintiff any part of said $3,490, or of the avails of the property and debts of the company.

The plaintiff alleges that the defendants have not devoted their time and attention to the business of said company, as they should by the sixth article of agreement, and that they have charged more for services rendered than they were worth ; that they have given away and sold at prices greatly below their just value the goods of the company, to friends in Boston and elsewhere, in order to secure favor and credit to themselves in their private business ; that the defendants, in a transaction with Pratt & Bosworth, defrauded the company of $250 ; that the defendants have not stated an annual account on the ledger, of the stock, property and assets of said company, and of their debts and liabilities, as provided in the tenth article of said agreement ; that at the time of the dissolution the defendants had a capital of $2,000 ; that the plaintiff then had a capital of $2,200, and Came & Palmer a capital of $1,000 ; and that the defendants were then owing the company $1,000, while neither Came & Palmer or the plaintiff was owing any thing ; and that upon a just settlement of all the dealings of said partnership, and a full distribution of the assets, in accordance with the terms of dissolution, there would be a large sum due from the defendants to the plaintiff.

The plaintiff asks for an answer under oath, and for a particular statement in relation to each specification in the bill, and for a full disclosure in relation to the formation of said firm, its business and doings, its dissolution and the terms thereof, and the present condition of all its property, accounts, debts and credits.

The defendants in their answer admit the formation of the partnership, as alleged, and that the articles of agreement between them were as set forth in the bill ; but they say that these articles do not set forth the terms upon which said partnership was formed, in the following particulars : namely, that at the time of forming said partnership one Obed Chase was a dormant partner with the defendants, he owning one third of what they invested, which fact was known to all the parties and assented to by all ; that it was agreed by all the parties that the share of each in the capital stock should be $1,200, and no more, and that all the excess above that should be a debt due and owing from the firm to such partner as had invested more than that sum ; that it was agreed that Raymond should have authority to make certain verbal contracts in one department of the business, and that Came & Palmer should each have the same power in certain other departments ; that the company continued in this way till October, 1851, when said Obed Chase, with the knowledge and assent of all the other partners, became an open and ostensible partner in said firm, with a share of $400 in the capital stock ; and that it was then agreed that the capital stock of Putnam & Chase should be $800, of Obed Chase $400, and of the other members $1,200 each, and that all excess above these amounts should be considered as debts due to the partner investing the same, and that the profits and losses were to be shared

in the same proportion; that is, to Putnam & Chase two ninths, Obed Chase, one ninth, Raymond three ninths, and Came & Palmer three ninths, and that the entries were then made upon the books accordingly; that the partnership was carried on in that way till about the first day of March, 1852, when said Palmer sold his interest to said Came, who thereupon took all the rights and liabilities of Came & Palmer, and that the company as thus composed carried on business till the 8th day of October, 1853, when the same was dissolved by mutual consent of all the partners; that it was then agreed that Putnam & Chase should take certain property of the firm at $2,521.68, and that said Putnam & Chase and Came took certain other property, for which Putnam & Chase allowed the company $946.34, and that it was agreed that these sums, amounting to $3,468.02, should be applied by said Putnam & Chase in part payment of the debt due them from said company; that it was then agreed that Putnam & Chase should, for a reasonable compensation, collect the debts and dispose of the property of the company, and pay out their liabilities, first to third persons and then to partners, and that the defendants should take the property in the hands of others, to sell on commission, at a certain fixed valuation, and allow the company therefor.

They deny that they have ever given away any of the goods of the company, or sold them for less than their proper prices, to any persons, or that in the transaction with Pratt & Bosworth the company were defrauded or wronged in any way, and they explain that transaction; deny that they have in any way received any money that belonged to the company for which they have not fully accounted. They annex to their answer certain schedules, showing the amount of debts, debts collected, and from whom; the amount received for property sold; the amount received from factors, for goods sold on commission; the amount of the property returned and taken by them at the rate agreed on; the amount of debts paid, &c.

They allege that they have devoted their time and attention to the business of the company fully as much as they contracted to do, and that about August 1, 1853, it was agreed by the partners that they should receive $1.50 per day for such services, and they have always been charged at that rate upon the books of the company.

They deny that at the time of the dissolution the capital stock was owned as stated by the plaintiff, but say that the defendants owned $800, Obed Chase $400, and Raymond and Came each $1,200, and deny that they were indebted to said company in the sum of $1,000, or any other sum; nor do they claim that Raymond or Came were thus indebted, except as the firm was indebted to said partners or some of them. They state the amount which the company was owing to each partner at the time of the dissolution, reckoning all that was invested above the amount of the capital stock, as above stated, by each partner, as indebtedness to such partner. They allege that they have made up the yearly statement as required by the tenth article of the agreement; that they have

always been ready to render an account whenever demanded; but they say that it was agreed at the time of the dissolution that the property that they had purchased should go in payment of what the company was indebted to the defendants; that they were to collect the debts due the firm, and dispose of the other property of the company, and were to apply the proceeds first to pay the debts of those not members of the company (which they allege they have done), and then to pay what was due to Putnam & Chase until their debt should be reduced to the same amount of that of Raymond's; that they were then to divide equally with Raymond until both their debts were reduced to the same amount of Came's; and then that they were to divide equally the balance between the three. And they say that all they have received from all sources, after paying debts due to third persons, is not sufficient to pay all that the company owed them, or to reduce their debt down to the same amount with Raymond's; and they claim that the plaintiff is not entitled to receive any thing of them in this proceeding.

The case was heard upon the bill, answer and proofs.

*Lull*, and *Smith*, for the plaintiff.

*Wadleigh*, and *C. R. Morrison*, for the defendants.

SARGENT, J.    Article 2 of the partnership agreement provides that the capital stock of the Milford Plow Company shall be formed in the following manner: Each was to put in certain property therein specified, which was agreed to be an equivalent for cash, to a certain amount for each member, as follows:

| | |
|---|---:|
| Putnam & Chase, | $4,875 |
| J. G. Raymond, | 1,625 |
| Came & Palmer, | 1,200 |
| Making a total capital of | $7,700 |

Article 3 provides that each member of the partnership may increase the amount he has in the capital stock at pleasure, and may diminish it, but not so that it shall be less than $1,200.

By article 4 each member of the partnership shall be entitled to interest upon the sum by which his share in the capital stock shall exceed the smallest share owned in said stock by any of said partners, and the other members shall be jointly liable for such interest.

It is provided in article 5 that the losses shall be borne equally, and the profits equally divided between said partners, namely, one third to Putnam & Chase, one third to Came & Palmer, and one third to Raymond.

Article 11 provides that at the close of the partnership an account shall be taken and stated, and the stock and property and the debts shall be divided among the partners in proportion to the share which each has in the capital stock, after paying the liabilities of the firm.

Article 12 explains that it is the intention of the parties to form

a copartnership of only three members, the two firms constituting each but a single member of the new firm.

In regard to the formation of the partnership, its members originally, the adoption of the articles of agreement, and the terms of those articles, there is no dispute. It also appears that the partnership was dissolved, by mutual consent, on the eighth day of October, 1853.

The plaintiff's objection to the evidence tending to show that various parol contracts were made at the time of the formation of the company, outside the written articles of agreement, and conflicting with those articles, is well taken; and all that part of the answer alleging such parol agreements is irrelevant, and must be laid out of the case; because it is not competent for any party thus to contradict the terms of a written instrument by contemporaneous parol testimony, any more in equity than at law; *Heath* v. *Derry Bank*, 44 N. H. 174; and so much of the answer as relates to the agreements made at the time of the dissolution, so far as that the defendants purchased a part of the property, and were to close up the affairs of the company, is not in dispute; and as to so much as relates to the agreement in relation to the application of the assets to pay the debts of the several partners, we shall find that substituting "capital stock" for "debts," so as to make it correspond with the written agreement, and the agreement set forth by the defendants, would not be in conflict with the written articles, but, as we shall see, will accord therewith.

We do not find that there was any change in the number of partners, or in the terms of the partnership agreement, during its continuance, nor until the final dissolution. It is alleged that Obed Chase was a dormant partner with the defendants at the time of the formation of this company, and that he afterward became an ostensible partner, with the knowledge of all the partners in the plow company. But his becoming an ostensible partner did not, in fact, change his relations to either firm. He was interested in both, the same before as after he became such ostensible partner with Putnam & Chase.

But it is evident that he did not become a separate partner and member in the plow company for two reasons : First, It would have been in direct conflict with the 12th article, which provided that there should be but three ; and, second, because if he had become a separate member he must, by the 5th article, have been held responsible for an equal share of the losses, and have been entitled to an equal share of the profits with each and every other separate member, which is not pretended, but the contrary is alleged in the answer.

Putnam & Chase, therefore, whether with or without dormant or ostensible partners, whether one or more, are to be and constitute but one member of the new firm. The partners of the firm of Putnam & Chase may be few or many ; they may own stock in equal or unequal proportions in that firm ; they may be dormant or ostensible partners ; still Putnam & Chase are but a single member of the new plow company. Obed Chase's changing from a dormant partner to an active one in the firm of Putnam & Chase, would not in the least affect either his own relative position, or that

of his firm, to the new firm of which his firm had been and still continued to be a member. Chase may have kept the books as he says, keeping Obed Chase's accounts separate from his own and Putnam's, as a matter of convenience to his own firm ; but that did not bind any body else, and was no evidence of a change of members, or of the terms of agreement in the new plow company.

Nor was there any change when Palmer went to California. It is alleged by the defendants that he sold out his interest to Came ; but Palmer testifies that he is still interested the same as ever ; and it is not very certain, upon the evidence, how that fact was. But even if it was a sale, it is evident that it was understood and assented to by all that Came should act for and represent that firm in the new plow company, and that every thing should proceed as before. Nothing was withdrawn from the company ; no change was made ; since the accounts are kept in the same way before and after this change, without any mention of such change, and without any notice of it whatever.

So, then, we are only to consider the written articles of agreement, and apply them to the settlement of all the questions that arise in this case from the commencement of the copartnership, May 5, 1851, to October 8, 1853, the day of its dissolution.

We can well enough conceive that after the company had gone into operation it might have been found convenient that Raymond and Came & Palmer should be authorized to make certain verbal contracts in their several departments, and such a usage might naturally enough grow up and be assented to ; and in that way the written article on that subject may have been subsequently modified by parol or by usage and consent. But this would be a very different thing from making an agreement by parol at the same time that another was made in writing, and directly conflicting with it. Whether there has been any such modification of the sixth article it is not material to settle, as it has no bearing upon any of the questions arising here.

It is admitted that Putnam & Chase were to collect the debts due the firm after its dissolution ; were to take the plows returned at a fixed price, and close up the affairs of the company, which it appears they have done ; and there is nothing to show that this has not been done properly and in good faith, nor are any of the charges of fraud or misconduct or mismanagement on the part of the defendants sustained by the evidence. It appears from the schedules annexed to the answer, and from the other evidence, that the defendants bought certain property of the firm at the time of the dissolution, for themselves alone and for themselves and Came,

| | |
|---|---:|
| amounting to | $3,468.02 |
| That since the dissolution they have collected debts, as per schedule A, | 2,206.00 |
| Debts collected of factors, as per schedule B, | 1,226.41 |
| Doubtful debts collected, as per schedule F, | 188.26 |
| Plows returned, as per schedule K, | 434.84 |
| Making a total received by the defendants of | $7,523.53 |

Deduct debts paid to third persons by the defendants, in-
cluding J. Raymond's execution,                              3,888.67

And it leaves in the defendants' hands,                      $3,634.86
But it appears that Chase has since his answer collected
   $13.30, and paid out $5.84, so that there should be added
   to the above the balance of                                   7.46

Making the whole balance now in the defendants' hands,  $3,642.32
For this amount there should be deducted a reasonable
   commission for collecting the debts (but nothing upon
   the property bought of the firm, or on the plows which
   the defendants were to take at an agreed price), in sched-
   ules A, B and F, and the $13.30 collected since the an-
   swer, amounting in all to $3,633.97 ; and upon this sum
   2½ per cent would be a reasonable commission, amount-
   ing to                                                        90.85

Which would leave a balance in the defendants' hands of $3,551.47
Came has also received since the dissolution,                 103.20
Raymond has received since the dissolution,                   281.52

Making the total assets now in the hands of all partners,  $3,936.19

Let us next find the amount of capital stock of each partner at
the time of the dissolution, calling all that each member had in
the concern capital stock, the members remaining substantially
the same from its commencement to its close.   This capital stock
will be found by adding to the amounts invested by each, at the
commencement, the interest on the amount invested by him above
the amount of $1,200 ; also, by adding the amount added to this
capital by the services rendered by each and amounts paid, and
deducting therefrom the amount of the indebtedness of each to the
firm for such articles as they had received during the same time.
It appears that the account of each partner was kept in that way
each year, and that nothing was divided during the existence of the
company, and nothing was paid as interest on stock, or paid by the
members of the copartnership for what they received from the firm.
It appears that the accounts kept in this way up to August 1, 1852,
showed that the capital stock of each, including the whole original
investment, was as follows :

Putnam & Chase (including Obed Chase),                       $6,476.77
J. G. Raymond,                                                2,468.22
Came & Palmer (represented by Came),                         1,387.56

But Chase, in his deposition, cross-interrogatory No. 16, states
the amount due each partner, October 8, 1863, the day of the
dissolution, and including the whole of the original investment
of each, but exclusive of interest from August 1, 1863, as fol-
lows :

Putnam & Chase (including Obed Chase),     $6,424.17

Then taking the average amount between August 1 and October 8, 1863, and casting interest upon the excess above $1,200 for two months and seven days, and it gives as interest,     58.63

Making their whole investment October 8, 1863,     $6,482.80

He also states in the same way the investment of Raymond, October 8, 1863, at     $2,550.72

Casting interest as before on average capital over $1,200, for two months and seven days,     14.62

Raymond's whole investment, October 8, 1863,     $2,565.34

He also states in the same way the investment of Came, October 8, 1863, at     $1,433.56

Casting interest as above on his average capital above $1,200, for two months and seven days,     2.35

Came & Palmer's whole investment, October 8, 1863,     $1,435.91

Adding these three total amounts of investments together, we have, as the total investments of all the partners, October 8, 1863,     $10,484.05

This is as near an approximation to accuracy as I am able to make from the data given in the evidence, but it can only be an approximation, of course.

We thus find this company commencing with an aggregate capital stock of $7,700, and after continuing business about two years and five months this aggregate capital stock has increased to $10,484.05

And then, upon closing up the affairs of the copartnership, collecting debts, disposing of property and paying debts, there remains of the assets in all only     $3,936.19

Deducting total assets from total investments, it shows a loss of     $6,547.86

Surely, there must have been some very large waste-gates to this establishment, or, if not large, they must have been very numerous.

The plaintiff complains that the account required by the 10th article in the agreement was not made and stated upon the ledger, according to the provisions of that article. It seems that this account, in August, 1862, also in August, 1863, and at the close in October, 1863, had been made on several sheets of bill paper, stitched together in pamphlet form ; and the two first are presented in evidence. These accounts are just as intelligible and more convenient for reference, perhaps, in their present form than they would be upon the ledger; and it is in evidence that these pamphlet accounts were kept with the other books used and examined by the members and by this plaintiff, and no objection was ever made to the form of the account in that particular. The last account was

not only examined by the plaintiff, but was loaned to him to carry to his counsel (Mr. Lull), in whose possession it is last shown to have been ; but by some accident it has never been returned.   We think, so far as there has been any variation from the written article, there is evidence of the plaintiff's assent to such modification of the original article, as there is, also, of all the other members of the firm ; nor can we see that the plaintiff can have been injured by such a change.

The next question that arises is in relation to the distribution of the assets.   What proportion is each to have ?   Why, clearly, by the 11th article, these assets are to be divided among the partners, in proportion to the share which each has in the capital stock, after paying the debts of the firm.   The plaintiff, relying upon this article, claims that Raymond is entitled to share the property in the defendants' hands with them, in the same proportion that his stock bears to theirs, which would give him something over one third as much of these assets as the defendants receive, and that Came is to share in the same, according to the amount of his stock.   This would have been so under this article, had the 5th article been omitted altogether, or had the provision of that article been that the profit or loss should have been shared, not equally, but in proportion to the capital stock of each at the close of the copartnership.

But the 5th article provides that the losses and profits shall be shared equally, one third by each member of the new firm ; and before it can be ascertained what the assets are that are to be divided, the profits are first to be divided equally, and the balance will be the assets to be divided, according to the amount of capital stock ; or if there have been losses they must first be borne equally by the several members, one third by each, and the balance, after sharing the losses in that way, is to be divided by article 11.

Thus, although Putnam & Chase had at first three times the amount of stock that Raymond had, and four times the amount that Came & Palmer had, yet they were to receive interest on all above $1,200, and were only to have an equal share of the profits with each of the others, and were only to bear an equal proportion of the loss.   Now we have seen that the whole loss during the continuance of the company was $6,547.86.   Dividing this by three, it gives the loss to each, $2,182.62 ; so that each is to first share his proportion of the loss before the dividend of assets can be made. Properly, if a profit had been made, this would first be divided equally, which would leave just the capital stock to be divided ; or if a loss is made, each should first pay his proportion of the loss ; and if this were done then the stock would remain, for each one to take just what he put in.

Suppose in this case the company had gained $6,000 instead of losing that amount: then each would have been entitled to an equal third of the profits ($2,000), and this would have been first divided, and that would have left just the same amount of capital stock for each to take out that he had put in.   But now the tables are turned, and if each partner were to pay in his amount of the

loss ($2,000 and more), that would make the amount of stock good, so that each could receive just what he had invested in stock. It will be seen at a glance that if each partner paid in his proportion of the loss, that would make the whole loss, which, with the assets on hand, would equal the whole amount of capital stock invested; and then, each having shared his proportion of the loss, according to the 5th article, the assets could be divided according to the 11th article, and each would have just the amount he put in. But if, instead of paying in each his proportion of the loss, and then receiving his share of the investment, we offset the amount of loss to. the share he is to receive as capital stock, the result will be the same.

| | |
|---|---|
| Putnam & Chase have invested in all, | $6,482.80 |
| Deduct their proportion of the loss, | 2,182.62 |
| And it leaves for them to come from the assets, | $4,300.18 |
| But they have received in all only | 3,551.47 |
| Leaving still due to them, above all they have received, | $748.71 |
| Raymond has invested in all, | $2,565.34 |
| Deduct his proportion of loss, | 2,182.62 |
| And it leaves for him to come from the assets, | $382.72 |
| But he has already received from the assets, | 281.52 |
| Which leaves due to him only | $101.20 |
| Came's share of the loss is | $2,182.62 |
| While he has invested in all only | 1,435.91 |
| Deducting his whole investment from his share of the loss, and it leaves him in debt to the company, | $746.71 |
| Came has also received of assets, since dissolution, | 103.20 |
| This added to the other indebtedness, he owes the company, | $849.91 |

Now if Came should pay in this amount, which he is bound to do by the 5th article, in order to bear his equal proportion of the loss, it would just meet the amounts due to Putnam & Chase and to Raymond. $748.71+$101.20=$849.91. Thus we see that Came or Came & Palmer owe the company just enough to pay the amounts due to Putnam & Chase and to Raymond, and leave each thus to share an equal proportion of the loss, and then to divide the assets according to the amounts invested by each.

The present bill must necessarily be dismissed in its present form : First, for want of proper parties. All who are to be directly affected by the decree must be made parties to the bill. Obed Chase should be joined as one of the firm of Putnam & Chase. Came should also be joined, or Came & Palmer; and as it is not certain how that share does stand, the only safe way will be to make both Came and Came & Palmer parties to the bill. And,

second, because Raymond has evidently no claim upon the defendants. But, leaving Came out of the question, the defendants have a claim against the plaintiff for something, because, if nothing can be got of Came, then the loss by him is to be borne equally by the other two, probably; so that the defendants would have a right to call on the plaintiff to pay them such a sum as would equalize their losses by Came. But if Came is made a party and is responsible, then, when he pays in what he owes, the plaintiff can recover his balance of $101.20, while the defendants would be getting the balance of $748.71 which remains due to them. Even if the loss by Came were to be borne by the other two partners, not equally, but in proportion to the sums invested by each, then it will be seen that there would be a balance due from the plaintiff to the defendants, provided they must lose the amount due from Came.

Assuming that the written articles of agreement do not include and regulate such losses as this, still, how should partners who are associated together, and are to share the profits and losses equally, adjust a loss by the failure of one of their own number to pay or share his proportion of the general loss, otherwise than by sharing such loss equally between them? Raymond was as much the surety of Came to the company as Putnam & Chase were; and if this is a joint debt to the other members of the firm, then in case of loss they would all share the loss equally. But we do not need to decide this question here, as in any event this plaintiff can recover nothing of these defendants. If not amended, the bill must be dismissed with costs; and if amended, the defendants will be entitled to their costs to this time.

In this way it will be observed that the same result is reached that the defendants contend for in their answer, though in a different way; not by contradicting the written articles of agreement, but by applying and enforcing them.

Let us illustrate the principle involved in this case by a simple example, which we will suppose. Three partners go into company. A puts in $2,000 and B and C $1,000 each. A is to draw interest on $1,000 of his capital, and they are to divide the profits and share the losses equally; and at the close each is to share in the assets in proportion to the amount of his investment or share of the capital stock. Suppose at the end of two years they close up, and find they have made a profit of $3,000. They divide the profit equally, and take $1,000 each. This leaves the capital stock so that each has what he invested.

But suppose, at the end of two years, on closing up, they have lost $3,000. This is to be borne equally. The share of each to lose is $1,000. Now it will be seen at a glance that it makes no difference whether each pays in his share of the loss in cash, and then divides the assets in proportion to the amounts invested, or offsets the loss against his capital stock before he receives his share of the assets. They have lost $3,000 out of $4,000 of capital, which leaves the assets only $1,000. The result will be precisely the same if A takes the whole of the $1,000 that is left, and the others take nothing, that it would be for each to pay in $1,000 (his share of the

loss) and then to divide, and A take $2,000 and B and C $1,000 each. The share of loss for B and C is just equal to the capital stock, and A's loss is just half his capital stock.

But suppose the loss to be $6,000, which would be $2,000 more than all the capital stock: Then, as between themselves, B and C must pay each $1,000 more, beside losing all their capital stock, while A loses nothing but his capital stock, because his stock is double theirs, and his share of the loss is only the same as theirs. In all these cases we are considering the liability of the partners as among themselves, and not as to third persons.

But again: Suppose A has $2,200 of the stock, B $1,100 and C $700, making $4,000 capital, as before, with the same conditions as before, and at closing they find a loss of $3,000. If each pays in his share of the loss ($1,000), that restores the capital stock, so that each can have just what he invested. But if, instead of paying in the loss, they offset that against their investment, then A would be entitled to receive of the assets $1,200, that being his share of capital above his share of loss; B would be entitled to receive $100, that being the amount of his stock above his share of the loss; C would owe $300, that being the amount that his capital stock falls short of making his proportion of the loss. Now if C pays his $300, and thereby shares his proportion of the loss, then A and B can get what belongs to them; the $1,000 of assets and the $300 paid by C, making $1,300, which will give A his $1,200 and B his $100. But suppose A has the $1,000 — all the assets except the $300 due from C — in his hands, and C becomes bankrupt and fails to pay his $300: how does the case stand between A and B? A has got all the assets, B has got nothing. B calls on A to divide with him in proportion to their capital stock. But the company still owes A $200, and it owes B but $100. If this loss by C is to be borne by A and B in proportion to their several amounts of capital stock, then neither could claim any thing of the other; because, although B has received nothing while A has received $1,000, yet the amounts they have lost over and above their $1,000 each is now just in proportion to their capital stock, namely, two to A to one to B. But if this loss by C is to be borne equally between A and B, then A could rightfully call on B for $50, in order to equalize their loss by C, after having shared equally in the general loss by the company. That would be very much like the case before us, though here the defendants would have some claim upon the plaintiff in any event, if Came should not pay in the amount he owes the company; but if he does pay, then all parties will get their dues.

*The bill to be dismissed, unless amended.*